U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

JUN 2 5 2010

CLERK, U.S. DISTRICT COURT
By_____
　　　　　Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| CAROLYN BASSETT, | § |
| PLAINTIFF, | § |
| | § |
| v. | § CIVIL ACTION NO. 4:09-CV-142-A |
| | § |
| MICHAEL J. ASTRUE, | § |
| COMMISSIONER OF SOCIAL SECURITY, | § |
| DEFENDANT. | § |

## FINDINGS, CONCLUSIONS AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE
## AND
## NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b).  The Findings, Conclusions and Recommendation of

the United States Magistrate Judge are as follows:

### I. FINDINGS AND CONCLUSIONS

A.　　Statement of the Case

Plaintiff Carolyn Bassett filed this action pursuant to Sections 405(g) and 1383(c)(3) of

Title 42 of the United States Code for judicial review of a final decision of the Commissioner of

Social Security denying her claims for disability insurance benefits under Title II and

supplemental security income ("SSI") benefits under Title XVI of the Social Security Act

("SSA").  In March 2007, Bassett applied for disability insurance and SSI benefits, alleging that

she became disabled on November 10, 2006.  (Transcript ("Tr.") 71-75, 324-26; *see* Tr. 27.)  Her

applications were denied initially and on reconsideration.  (Tr. 53-61, 63-70, 328-31; *see* Tr. 47-

48, 51, 62, 327.)  The ALJ held a hearing on April 1, 2008 (Tr. 11; *see* Tr. 35) and issued a

1

decision on April 21, 2008 that Bassett was not disabled because she was capable of performing

work that existed in the national economy. (Tr. 27-32.) Bassett filed a written request for review

(Tr. 22-23), and the Appeals Council on October 9, 2008 notified Bassett that it was granting

Bassett's request for review. (Tr. 8, 335-37.) Thereafter, the Appeals Council issued a decision

that it was adopting the findings in the ALJ's April 21, 2008 decision. (Tr. 8-10.) However, the

Appeals Council also stated:

> The Administrative Law Judge found that the claimant retains the residual
> functional capacity to perform a limited range of light work and is not disabled
> within the framework of Medical-Vocational Rule 202.14.  The Council agrees
> with this finding.  However, the Administrative Law Judge did not adequately
> consider the effects of the claimant's obesity in accordance with Social Security
> Ruling 02-1p.  The combined effects of obesity with other impairments can be
> greater than the effects of each of the impairments considered separately.
>
> The claimant experiences significant obesity.  She is 65 inches in height.
> On December 4, 2006 her weight was recorded at 263 pounds, which translates to
> a Body Mass Index (BMI) of 46.6.  Her weight was down to 241 pounds on June
> 26, 2007 for a BMI of 42.7.  The claimant continued to lose weight and on April
> 6, 2007 she weighed 229 pounds for a BMI of 40.6.[1]
>
> We have given further consideration to the claimant's obesity and
> conclude that this impairment does not have more than a minimal effect on her
> ability to perform work-related activities and would not further reduce the
> residual functional capacity established by the Administrative Law Judge.
> Examination findings show that she is able to stand, walk and use her arms and
> hands normally and there is no indication that the claimant's obesity produces
> limitations which exceed those established by the Administrative Law Judge.

(Tr. 8-9.)  Thus, the ALJ's decision stands as the final decision of the Commissioner.

B.      Standard of Review

Disability insurance is governed by Title II, 42 U.S.C. § 404 *et seq.*, and SSI benefits are

governed by Title XVI, 42 U.S.C. § 1381 *et seq.*, of the SSA.  In addition, numerous regulatory

---

[1] The Court notes that April 6, 2007 actually occurred before June 26, 2007.

provisions govern disability insurance and SSI benefits.  *See* 20 C.F.R. Pt. 404 (disability insurance); 20 C.F.R. Pt. 416 (SSI).  Although technically governed by different statutes and regulations, "[t]he law and regulations governing the determination of disability are the same for both disability insurance benefits and SSI."  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

The SSA defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity.  42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).  To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed.  20 C.F.R. §§ 404.1520, 416.920 (2009).  First, the claimant must not be presently working at any substantial gainful activity.  Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit.  20 C.F.R. §§ 404.1527, 416.972.  Second, the claimant must have an impairment or combination of impairments that is severe.  20 C.F.R. §§ 404.1520(c), 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000).  Third, disability will be found if the impairment or combination of impairments meets or equals an impairment listed in the Listing of Impairments ("Listing"), 20 C.F.R. Pt. 404, Subpt. P, App. 1.  20 C.F.R. §§ 404.1520(d), 416.920(d).  Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work.  *Id.* §§ 404.1520(e), 416.920(e).  And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience.  *Id.* §§ 404.1520(f), 416.920(f);

3

*Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999). At steps one through four, the burden of proof rests upon the claimant to show he is disabled. *Crowley,* 197 F.3d at 198. If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Id.*

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater,* 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen,* 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id.* A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel,* 209 F.3d 413, 417 (5th Cir. 2000); *Hollis,* 837 F.2d at 1383.

C.   Issues

1.   Whether the ALJ improperly evaluated Bassett's credibility.

2.   Whether substantial evidence supports the ALJ's assessment of Bassett's physical residual functional capacity ("RFC").

4

3.  Whether substantial evidence supports the ALJ's assessment of Bassett's mental RFC.

4.  Whether substantial evidence supports the ALJ's findings at Step Five.

D.    Administrative Record

1.  Relevant Treatment History

In April 2006, Bassett was hospitalized at North Hills Hospital because she was having trouble breathing. (*See* Tr. 137-47.) On May 1, 2006, Bassett was seen for a routine follow-up examination due to her bronchial asthma and her weight was recorded at 279 pounds. (Tr. 193.) On June 15, 2006, Noble Eznkanma, M.D., reported that Bassett had "[b]ronchial asthma which improved on Asmanex" and "[p]ulmonary nodule." (Tr. 150.)

Bassett was hospitalized from November 11 to November 13, 2006 at Harris Methodist Hospital ("Harris Hospital") due to an acute onset of weakness spells. (Tr. 151; *see* Tr. 151-63, 286-312.) She reported that she did not feel she could move her right side very well and she had a headache, some nausea and vomiting, and blurry vision. (Tr. 151, 309-10.) She was diagnosed with morbid obesity, hypertension, and "[w]eakness spells, possible transient ischemic attack." (*Id.*) In the discharge notes, Minh Nghi, D.O., stated the following:

> The carotid ultrasounds showed no significant atherosclerotic plaque. CT of the head was done which was read out as normal. The patient could not tolerate the MRI even with sedation because she felt extremely claustrophobic.

> Her symptoms did resolve and she had good strength back to normal baseline on the day of discharge. . . .

> We checked her cholesterol level and her HDL was decreased at 39 and LDL was 109. I counseled the patient at length regarding therapeutic lifestyle changes including increased exercise level, diet control, and weight loss. She understood and said she would try this in lieu of trying any medications at this time.

Physical therapy was consulted but I do not believe that she will need inpatient physical therapy at this time.

(Tr. 151.)

On November 22, 2006, Bassett sought treatment for heavy vaginal bleeding. (Tr. 185.) She weighed 261 pounds. (*Id.*) Bassett was evaluated on December 4, 2006 by Charlece Hughes, D.O. ("Hughes"), a clinical neurologist. (Tr. 164-65.) Hughes noted that Bassett was treated at Harris Hospital for a brief episode of right side weakness that might have been a TIA. (Tr. 164-65.) Hughes noted that Bassett's "symptoms lasted about 30 minutes and completely resolved." (Tr. 164.) Hughes further stated that, since Bassett's discharge from Harris Hospital, she has experienced intermittent headaches but no further weakness spells. (Tr. 164.) She noted that Bassett had anemia, gastroesophageal reflux disease ("GERD"), hypertension, and intermittent headaches with generalized anxiety. (*Id.*)

Bassett was transported to Harris Hospital on December 12, 2006 as she was complaining of abdominal pain, dizziness, light-headedness, general weakness, nausea, and a migraine headache. (Tr. 265-68.) Her weight was recorded at 115 kg (or 253 pounds) and she reported that she had undergone a colonoscopy and endoscopy the day before. (Tr. 183, 274.)

On December 14, 2006, Bassett underwent a hysterectomy at Harris Hospital. (Tr. 166; *see* Tr. 166-71, 261, 264.) Her weight was 253 pounds and her BMI was 48. (Tr. 168.) Upon discharge from the hospital, she was diagnosed with myometrial hypertrophy, bilateral cystic

6

teratoma of the ovaries, and "postoperative status laparoscopically assisted vaginal hysterectomy and bilateral salpingo-oophorectomy."[2] (*Id.*)

In December 2006 and January 2007, David Bass, M.D. ("Bass") treated Bassett for persistent stomach problems. (Tr. 173-78.) During her treatment, Bassett's weight decreased from 263 pounds on December 6, 2006 to 248 pounds on January 3, 2007. (Tr. 174, 178; *see also* Tr. 181 (noting that Bassett weighed 242 pounds on January 4, 2007).) Bass performed an upper endoscopy and found that Bassett had gastritis, a hiatal hernia, and Helicobacter pylori. (Tr. 173; *see* Tr. 200-03.) In a letter dated December 6, 2006, Bass stated:

> She had a CT scan of the abdomen and pelvis which showed bilateral adrenal fat containing cysts consistent with dermoid cysts. The left contains more fat than the right. The left is larger measuring 9 cm maximal dilator. She also had a fatty liver along with mild cardiomegaly. The CT scan of the abdomen was unremarkable. The lower Doppler study was negative for deep venous thrombosis. The portable chest x-ray was unremarkable except for mild cardiomegaly. Her blood work revealed the hemoglobin was 11 and hematocrit was 34.3. The PT and PTT were within normal range. The cardiac enzymes were negative. Urinalysis was unremarkable. Amylase and lipases were normal . . .
>
> Since then, the patient has been feeling better. . . . Because of the abdominal pain associated with anemia, she came and saw me in the office today.
>
> . . . .
>
> . . . Currently, she is scheduled for a hysterectomy because of the abnormal abdominal ultrasounds.
>
> . . . .

---

[2] Salpingo-oophorectomy is the surgical removal of a uterine tube and ovary. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1690 (31st ed. 2007).

> REVIEW OF SYMPTOMS: Remarkable for weight loss and headaches associated with weakness. She has been alternating constipation with diarrhea along with back pain and difficulty in swallowing. Respiratory system is remarkable for shortness of breath . . .

(Tr. 176.) Bass's clinical impression was that Bassett had GERD, abdominal pain, and anemia. (*Id.*)

On January 10, 2007, Bassett, who weighed 244 pounds, reported that she was under much stress, shaky, could not catch her balance, and having a possible TIA. (Tr. 190.) She was prescribed Plavix and "put on aspirin." (*Id.*)

Throughout February 2007, Bassett was seen by Philip Abbott, M.D. ("Abbott"), for a post operative follow up appointment. (Tr. 180.) Her weight was recorded at 235 pounds on February 2, 2007 (Tr. 181) and 230 pounds on February 12, 2007 (Tr. 189). In a Disability Certification dated February 2, 2007, Abbott opined that Bassett had recovered sufficiently to be able to perform her regular duties at the Boys and Girls Club, beginning on February 5, 2007. (Tr. 316.) On February 12, 2007, Bassett was seen for a cough, leg pain, and possible anxiety attacks, and she reported that she was having trouble swallowing. (Tr. 189.)

April Langham, D.C. ("Langham"), examined Bassett on March 8, 2007 for complaints of moderate to severe daily neck, upper back, and low back pain that "extended into her left anterior and lateral thigh as tingling." (Tr. 209; *see* Tr. 210-21.) Bassett also reported that she was having intermittent numbness in both hands at night while sleeping. (Tr. 209.) Langham, in a letter dated April 2, 2007, stated:

> My initial assessment of the patient's complaint is pelvic and cervical segmental dysfunction and muscle spasm resulting in paresthesia of the lower and upper extremities. Cervical x-rays revealed moderate levels of degenerative joint

8

disease at C2-C6.  Currently, activities such as walking, standing, or sitting for extended periods of time would aggravate her condition.

(Tr. 209.)

In an undated[3] "Disability Report – Adult," Bassett reported that she was 5'3" tall, weighed 230 pounds, and that stopped working on November 10, 2006 because she had a stroke. (Tr. 95-96; *see* Tr. 95-103.)  She stated that she had sharp pains in her legs, limited use of her hands, trouble walking, and that she cried "at odd times."  (Tr. 96.)  She reported that she was taking a wide variety of medications but did not list any side effects from the medications.  (Tr. 101.)

In a "Daily Activity Questionnaire" dated March 22, 2007, Bassett reported that she experienced sharp pains in her thighs and her head felt "like a lot of bricks."  (Tr. 112; *see* Tr. 112-14.)  She stated that on an average day she would go to the doctor, cook, lie down, and sometimes walk around the block.  (Tr. 113.)  She indicated that her physical problems limited her ability to sit, stand, walk, lift and carry, use her hands, kneel, squat, climb, reach, speak, drive a car, read a newspaper, watch television, perform housework and yard work, engage in recreational activities, and take care of her personal needs.  (Tr. 113.)  She further stated that her therapy treatment was helping "alot."  (Tr. 114.)

On April 6, 2007, Bassett went to the doctor complaining that she had been experiencing a backache and blurred vision for the past seven days.  (Tr. 322.)  She weighed 229 pounds, and she was diagnosed with, *inter alia*, back pain, tonsillitis, and allergies.  (Tr. 323.)

---

[3] Based on information in a subsequent "Disability Report – Appeal" in the record, it appears that this Disability Report may have been prepared on March 22, 2007.  (*See* Tr. 115 (stating that date of last disability report was 03/22/2007).)

In another DAQ, dated April 14, 2007, Bassett reported that she had periodic crying spells, headaches, and pain in her legs and back. (Tr. 121; *see* Tr. 121-25.) She stated that on an average day she prepared dinner for her children, bathed and dressed herself, and tried to read but had trouble focusing. (Tr. 122.) She indicated that her sons helped her with her finances, the shopping, and household chores. (Tr. 122-23.) She further reported that she went to church twice a week with her sons. (Tr. 124.)

On May 16, 2007, Jason Simpson, ("Simpson") Psy.D., performed a psychological evaluation of Bassett at the request of the Disability Determination Services. (Tr. 222-27.) At the evaluation, Bassett reported that she had become depressed after she had a TIA in November 2006 followed by a hysterectomy. (Tr. 222.) She stated that she had hallucinations, crying spells, problems sleeping, and decreased interest in activities and that she had lost 49 pounds since November 2006. She also reported that she was experiencing anxiety and avoided going to public places because she was afraid she would have an anxiety attack. (Tr. 222, 225.) She stated that she was able to take care of herself, drive a car, cook, and manage her finances but that her children did the shopping and ran errands for her. (Tr. 222.) She reported that she got along well with others and attended church. (*Id.*)

Simpson diagnosed Bassett with an adjustment disorder with anxiety and depressed mood and a panic disorder without agoraphobia. (Tr. 226.) He stated that her prognosis was good and "[c]ontingent upon individual psychotherapy with a LCSW or Psychologist with conjunctive supportive medication management by a Psychiatrist." (Tr. 227.) He further opined, "[T]his individual is not, as she presented on this date, able to manage benefit payments in her own

10

interest. This claimant does, in my opinion, have a basic understanding of the meaning of filing for benefits." (Tr. 227.)

Bassett was referred to Kokila Thirumurthi, D.O. ("Thrumurthi"), for a disability examination. (Tr. 228-31.)  Thirumurthi examined Bassett on June 26, 2007 regarding her complaints of back and neck pain, asthma, and hypertension. (Tr. 228.)  Bassett reported that she was having weight loss, chest pain that radiated to her right arm, neck and legs, weakness, shortness of breath, abdominal pain, blurry vision, and pain in her legs. (Tr. 228-29.)  Bassett also reported that she had lower back pain that had worsened since her stroke in 2006 and that was alleviated by a "supine position and Flexeril." (Tr. 228)  She stated that she had cervical neck pain that did not prevent her from doing all of her activities of daily living and was also lessened by taking Flexeril. (Tr. 228.)  Thirumurthi noted that Bassett weighed 241 pounds and was able to get on and off the examination table without difficulty. (Tr. 229.)  He further reported the following: (1) Bassett could stand on her toes, but not her heels, (2) Bassett was able to bend over and get back up with difficulty and with about 50% of the range of motion limitation, (3) Bassett was not able to squat and get back up without difficulty and refused to do so, (4) Bassett's right leg is one to two inches shorter than her right leg, (5) Bassett's spine, ribs, and pelvis were positive for tenderness, and (5) Bassett had decreased pinprick and touch sensation along the left anterior and lateral side of her left thigh. (Tr. 229-30.)  In an MRI imaging report dated June 26, 2007, James Remkus, M.D., opined that Bassett had moderate degenerative disc disease with spondylosis[4] at the L4-5 and L5-S1 level. (Tr. 232.)

---

[4] Spondylosis is ankylosis of a vertebral joint. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1780 (31st ed. 2007). Ankylosis is the immobility and consolidation of a joint due to injure, disease, or surgical procedure. *Id.* at 94.

During an examination on July 12, 2007, Abbott, her post-operative follow-up physician, noted that Bassett weighed 245 pounds. (Tr. 314-15.) In another undated "Disability Report – Appeal,"[5] Bassett reported that her conditions had worsened since her last disability report on March 22, 2007. (Tr. 115; see Tr. 115-20.) She stated that the changes occurred in July 2007 and she was having "abdominal pain, gastritis/ulcer, hypokalemic, stroke, back and neck pain, headaches, peripheral neuropathy, chest pain, dehydration, hbp, depression." (Tr. 115.) She further reported that she was experiencing numbness in both legs, swelling and tingling in her left leg, and weight loss. (Id.) She indicated that she was taking a wide variety of medications, including Vicodin which caused her to have the side effects of dizziness and drowsiness. (Tr. 117.)

A Disability Determination and Transmittal ("DDT") Form, dated July 23, 2007 and signed by James Wright, M.D., indicated that Bassett was diagnosed with degenerative disc disease and panic disorder and was not disabled. (Tr. 46, 333-34.) A subsequent DDT Form, dated September 18, 2007 and signed by Roberta Herman, M.D. ("Herman"), indicated that Bassett was diagnosed with discogenic and degenerative disorders of the back and a stroke and not disabled. (Tr. 45, 332.) Another DDT Form, dated January 4, 2008 and signed by Herman, indicated that Bassett was diagnosed with, inter alia, discogenic and degenerative disorders of the back and an intracranial injury and was not disabled. (Tr. 44.)

In a Psychiatric Review Technique Form ("PRTF") dated July 19, 2007, Nancy Wilson, Ph.D. ("Wilson"), a State Agency physician, indicated that Bassett had the nonsevere

---

[5] Based on information in the Disability Report, it appears that this report was prepared in July 2007 or later. (Tr. 115-20.)

12

impairments of "adj disorder with anxiety and depressed mood" under Section 12.04 of the Listing and "panic d/o without agoraphobia; adj dis with anxiety and depr mood" under Section 12.06 of the Listing.  (Tr. 233, 236, 238; *see* Tr. 233-46.)  Wilson's complete assessment reflected findings that Bassett's mental impairments did not meet the complete criteria of Section 12.04 or 12.06.  (Tr. 233-46.)  Wilson opined that Bassett was mildly limited in her activities of daily living, maintaining social functioning and concentration, persistence, or pace.  (Tr. 311.) She noted that Bassett was able to perform all activities of daily living, take care of her children, and was socially active.  (Tr. 245.)  She also stated that Bassett's claimed limitations were not fully supported by the evidence in the record.  (*Id.*)

In a Physical Residual Functional Capacity Assessment ("PRFC") dated July 23, 2007, James Wright, M.D. ("Wright"), diagnosed Bassett with "ddd" and hypertension.  (Tr. 248; *see* Tr. 248-56.)   As to Bassett's exertional limitations, Wright opined that Bassett could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday, and had the unlimited ability to push and/or pull.  (Tr. 249.)  As to Bassett's postural limitations, Wright opined that Bassett had the ability to frequently climb ramps, stairs, ladders, ropes, and scaffolds, balance, kneel, crouch, and crawl and had the ability to occasionally stoop.  (Tr. 250.)  He further stated that, despite Bassett's limited range of motion and pain in her back, she retained the capacity to engage in substantial gainful activity.  (Tr. 255.)

2.  Administrative Hearing

Bassett was born on February 12, 1957, and she graduated from high school and has some college credits.  (Tr. 341.)  At the hearing before the ALJ, Bassett testified that she weighed 230 pounds, had two teenage children that lived with her, and her husband died in 1983. (Tr. 341.)  She stated that she had previously worked as a teacher's assistant at a school and most recently as an art director and assistant branch director at the Boys and Girls Club until early 2007 (Tr. 342-43.)  She claimed that she only worked for a short time in 2007 due to the stroke she had in November 2006.  (Tr. 343.)  She testified that since the stroke she has had back and leg problems, difficulties focusing and remembering things, and could only stand or sit for short periods of time.  (Tr. 343-44.)   As far as her mental impairments, she indicated that she had an appointment with MHMR that was coming up and she took antidepressants periodically for anxiety.  (Tr. 344.)  She testified that in an average day she would walk at a very slow pace, read, do some household work, and sometimes drive to the store at night when there were less people in the store.  (Tr. 345, 353.)  She also stated that she attended church on Sundays.  (Tr. 346.)  She further testified that she can only sit and stand for about twenty minutes at a time and she has problems with her hands swelling, shortness of breath, dizziness, and headaches three or four times a week.  (Tr. 347-49.)  She stated that she was very fearful and anxious that she was going to have another stroke.  (Tr. 351-52.)

Shelly Eike ("Eike"), a vocational expert ("VE"), also testified at the hearing.  The ALJ asked her to consider the following hypothetical:

> [A]n individual the Claimant's age, education, and work history.  Assume further the individual is limited to light work.  The individual could sit or stand at there [sic] option.  Could not climb, crawl, kneel, or squat.  Could occasionally

14

stoop and crouch. The individual has a less than moderate concentration deficient. Can not work with the general public. And is limited to non complex jobs. Are there any [jobs] in the national economy that such an individual could perform?

(Tr. 353-54.) Based on this hypothetical, Eike testified that such a person could perform jobs such as a small product assembler, small part inspector, and hand labor production worker. (Tr. 354.) She testified that all three of these jobs were unskilled, light level jobs with a specific vocational preparation level of two. (*Id.*) Upon further questioning by Bassett's attorney, Eike further stated these jobs would not allow for an employee to walk away from the work area, lie down twice a day for twenty minutes at a time, or work at a 25% reduced production pace. (Tr. 355-56.) She also testified that a person that was unable to concentrate on performing these jobs for two hours a day would not be able to maintain such jobs. (Tr. 356.)

3. ALJ Decision

The ALJ, in his April 21, 2008 decision, found that Bassett had not engaged in any substantial gainful activity since November 10, 2006, the alleged onset date of Bassett's disability. (Tr. 28, 31.) He further found that Bassett had the severe impairments of back pain and mild anxiety disorder. (Tr. 28, 31.) He held that none of Bassett's impairments, however, met or equaled any impairment in the Listing. (Tr. 28, 31.) As to Bassett's RFC, the ALJ stated:

> I have concluded that the claimant retains the residual functional capacity for light work, so long as she is able to sit or stand, at her option, while in the performance of job duties, and further limited by her inability to do any climbing, kneeling, squatting or crawling, no more than occasional stooping or crouching, a less than moderate concentration deficit, no contact with the general public while in the performance of job duties, and the need for non-complex job duties.

(Tr. 30.) In support of this RFC assessment, the ALJ went through an analysis of the evidence in the record. (Tr. 14-24.) As relevant here, he opined:

15

On November 10, 2006, the claimant sought emergency medical treatment citing right-sided weakness; she said that she was able to talk but that for some 30 minutes she was unable to move her arm or hand. As noted by Charlece Hughes, D.O., a clinical neurologist, "Her symptoms lasted about 30 minutes and completely resolved. She was unable to get her MRI due to claustrophobia and was to be scheduled for an outpatient open MRI. She did not get this scheduled[.]" Dr. Hughes wrote on December 4, 2006: "Since discharged, she has had no further weakness spells, but has intermittent headache. She has significant anemia and is scheduled for a hysterectomy soon[.]" The claimant was also noted as having GERD, complaints of recent anorexia and GI pain.

At the hearing the claimant made numerous references to her abilities prior to and after her 'stroke'. However, Dr. Hughes refers to the claimant's complete recovery, and she was able to undergo the hysterectomy and bilateral salpingo-oophorectomy on December 14, 2006. Upon her release from the hospital (after the hysterectomy) the claimant was told she could resume her normal activities, although she should not drive for a short while.

In January 2007 the claimant underwent an upper endoscopy that showed gastritis with hiatal hernia. She was treated with antibiotics. There is no evidence that this impairment would have prevented the claimant from engaging in basic work-related activities for 12 continuous months.

At the hearing the claimant also seemed to date an onset of back and neck pain to her 'stroke.' The claimant stated that since November 2006 she has back and leg problems, problems focusing, problems standing or sitting for more than short periods, and difficulty with her memory.

There is very little objective medical evidence to support the claimant's allegation of back pain. In 2007 she underwent a consultative medical evaluation. The claimant reported that she had low back pain, stating that the November 2006 stroke made it worse, and stating that since the stroke she has had lateral thigh weakness in her left leg. The claimant also complained of cervical neck pain, which she said was aggravated by walking, standing or prolonged sitting. The claimant also stated that she has chest pain, stating that she experiences a heavy sensation in the middle of her chest with radiation to her right arm, neck, and legs. The claimant said that chest pain usually takes about an hour to resolve.

The consultative physician, Dr. Thirumurthi, noted that the clamant did have elevated blood pressure, but the examination was otherwise negative for any acute abnormalities. The claimant was neurologically intact, and x-rays of the lumbar spine showed moderate degenerative disc disease with spondylosis at the L4-5 and L5-S1 levels, with no evidence of nerve root impingement.

16

There is some evidence that, perhaps secondary to the TIA event, the claimant developed an anxiety disorder, consisting of a fear of experiencing another 'stroke.'   In May 2007 the claimant underwent a psychological and mental status examination by Jason Simpson, Psy.D.  The claimant informed Dr. Simpson that since her stroke she had been experiencing crying spells, decreased ability to sleep, decreased appetite with loss of 49 pounds since November 2006, and loss of interest in maintaining relationships.  However, the claimant said that she did continue to attend church for structured social activities and that she got along well with her family and friends.  Dr. Simpson assessed the claimant with a panic disorder without agoraphobia, with a [Global Assessment of Functioning ("GAF")][6] of 61.[7]

I must address the claimant's allegation to Dr. Simpson of having lost 49 pounds since her TIA.  At the hearing the claimant testified that she weighed 230 pounds.  As of the time of her hysterectomy the claimant was noted as being 115 kilograms (253 pounds).  On February 6, 200[7],[8] her weight was 263 pounds.  On February 12, 2007 (six days later) her weight was quoted as being 230 pounds.  At the consultative medical evaluation done on June 26, 2007, the claimant again complained of 'weight loss' but her weight was measured at 241 pounds.  Needless to say, the claimant's allegation of large weight loss secondary to depression or anxiety is not credible.

I did not find the claimant's testimony credible.  The medical evidence is clear that she had, at most, a transient ischemic event that quickly cleared up.  Within days of the 'stroke' the claimant was medically passed to undergo a hysterectomy.  Her claim that she has cognitive limitations secondary to a stroke is not considered credible.

There is likewise no medical evidence to show that the claimant has a back impairment that result[s] in the extent of pain alleged by the claimant.

A medical doctor under contract with the state agency to review claims for disability examined the claimant's medical evidence as then constituted, and opined that the claimant retained the residual functional capacity for light work.

---

[6]A GAF score is a standard measurement of an individual's overall functioning level with respect to psychological, social, and occupational functioning.  AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994) (DSM-IV).

[7]A GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning.  DSM-IV at 34.

[8] The ALJ actually stated February 6, 2006.  Based on the medical evidence in the record and the context of his statement, the Court presumes this was a typographical error and the ALJ meant to say February 6, 2007.

> In accordance with Social Security Ruling 96-6p I have considered the medical doctor's opinion concerning the claimant's residual functional capacity.
>
> . . . .
>
> I have concluded that the claimant's [sic] has a mild impairment in activities of daily living, moderate difficulties in maintaining social functioning, mild to moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation.

(Tr. 28-30 (internal citations omitted).)

Based on the RFC assessment, the ALJ opined that Bassett was not able to perform her past relevant work but there were a significant number of jobs that existed in the national economy Bassett could perform. (Tr. 30-31.) Consequently, the ALJ found Bassett was not disabled. (Tr. 31.)

E.    Discussion

1. ALJ's Evaluation of Bassett's Credibility

In her brief, Bassett argues that the ALJ improperly evaluated her credibility. (Pl.'s Br. at 3.) Bassett claims that the ALJ found that she was not credible because her claims were based on, at most, a TIA event that quickly cleared up. (Id.) Bassett argues that the ALJ incorrectly asserts that she had no continuing symptoms from the event as there is "ample record evidence that shows otherwise." (Id.)

In evaluating a claimant's subjective complaints, the ALJ first considers whether there is a medically determinable impairment that could reasonably be expected to produce the claimant's pain or other symptoms. 20 C.F.R. §§ 404.1529(b), 416.929(b); Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996). Once the impairment is found, the ALJ evaluates the intensity, persistence and limiting effects of the symptoms on the

18

claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 96-79, 1996 WL 374186, at *2. A claimant's testimony must be consistent with the objective medical evidence and other available evidence. 20 C.F.R. §§ 404.1529, 416.929. In all cases in which pain or other symptoms are alleged, the administrative decision must contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's own observations. SSR 95-5p, 1995 WL 670415, at *2 (S.S.A. Oct. 31, 1995). A claimant's statements about pain and other symptoms are not conclusive evidence of disability, but must be accompanied by medical signs and findings of a medical impairment that could reasonably be expected to produce the pain or other symptoms alleged and that would lead to the conclusion that an individual is disabled. 42 U.S.C. § 423(d)(5)(A). An ALJ's unfavorable credibility evaluation will not be upheld on judicial review where the uncontroverted medical evidence shows a basis for the claimant's complaints unless the ALJ weighs the objective medical evidence and articulates reasons for discrediting the claimant's subjective complaints. *Abshire v. Bowen*, 848 F.2d 638, 642 (5th Cir. 1988); *see Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994).

Bassett complained in November 2006 that she was experiencing headaches, blurry vision, nausea, and vomiting and having problems moving her right side. (Tr. 151.) She later complained that she was having abdominal problems, headaches, weakness, numbness, shortness of breath, dizziness, shakiness, lightheadedness, nausea, and chest, leg, and neck pain. (Tr. 96, 112, 115, 121, 164, 173-76, 183, 189-90, 209, 228, 265, 322.) At the hearing before the ALJ, Bassett further claimed that the onset of her back and neck problems began in November 2006 when she had her alleged stroke. (Tr. 343-44.) At the hearing before the ALJ, Bassett testified

19

that she can only sit and stand for about twenty minutes at a time, she suffers from headaches three or four times a week and  has problems with her hands swelling, shortness of breath, and dizziness. (Tr. 347-49.)

The ALJ found that Bassett's testimony concerning her level of pain and functional limitations was not credible or supported by the medical evidence in the record.  (Tr. 31; *see* Tr. 28-30.)  In reaching this conclusion, the ALJ reviewed Bassett's testimony and the evidence in the record, including the following: (1) statements by Hughes that Bassett's TIA symptoms on November 10, 2006 lasted about 30 minutes and then completely resolved and that since being discharged Bassett has had no further weakness spells (Tr. 28), (2) medical evidence that Bassett was able to undergo a hysterectomy and bilateral salpingo-oophorectomy on December 14, 2006, a short time after her alleged stroke, and upon being released was told that she could, in essence, resume her normal activities (Tr. 28), (3) examination performed in July 2007 by Thirumurthi, a consultative physician, in which he did not find any *acute* abnormalities beyond elevated blood pressure and moderate degenerative disc disease (Tr. 29), (4) May 2007 examination by Simpson that indicated Bassett may have developed an anxiety disorder based on her fear of experiencing another stroke secondary to the TIA event (Tr. 29), (5) evidence in the record contradicting Bassett's allegations of a large amount of weight loss[9] (Tr. 29), and (6) Bassett's testimony that she continued to attend church and got along well with her family and friends  (Tr. 29.).

Based on the foregoing, the ALJ found that there was very little objective evidence supporting Bassett's allegations of back pain and determined that her testimony was not credible.

---

[9] Specifically the ALJ noted the following: (1) at the time of her hysterectomy in December 2006, Bassett weighed 253 pounds, (2) on February 6, 2007, she weighed 263 pounds, (3) on February 12, 2007, she weighed 230 pounds, and (4) on June 26, 2007, she weighed 241 pounds.  (Tr. 29.)

(Tr. 28-29.)   Contrary to Bassett's arguments, the ALJ did not discount Bassett's credibility *solely* because she had an alleged TIA event that quickly cleared up.   Instead, the ALJ went through a thorough discussion of the medical and other evidence in the record, specifically noting the evidence that refuted Bassett's complaints.   Because substantial evidence supports the ALJ's determination, the ALJ gave sufficient attention to Bassett's credibility, and he adequately explained the weight he assigned to her subjective complaints, the Court concludes that the ALJ did not err in discounting Bassett's credibility.

      2.   Physical Residual Functional Capacity

      In this case, the ALJ determined that Bassett had the *physical* RFC to perform light work,[10] so long as she was able to sit or stand, not climb, kneel, squat or crawl, and only occasionally stoop or crouch.   (Tr. 30.)   Bassett argues that the ALJ, by failing to properly consider the evidence in the record "pertaining to Plaintiff's medication side effects, obesity, and physical impairments," erred in determining that she retained the ability to perform light work with some postural limitations.   (Pl.'s Br. at 4.)

      RFC is what an individual can still do despite her limitations.[11]   SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996).   It reflects the individual's maximum remaining ability to do

---

[10] Pursuant to 20 C.F.R. § 404.1567, light work is defined as follows:

> Light Work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.   Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.   To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

[11] The Commissioner's analysis at Steps Four and Five of the disability evaluation process is based on the assessment of the claimant's RFC. *Perez v. Barnhart*, 415 F.3d 457, 461-62 (5th Cir. 2005).   The Commissioner assesses the RFC before proceeding from Step Three to Step Four. *Id.*

sustained work activity in an ordinary work setting on a regular and continuing basis. *Id.* *See Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). A regular and continuing basis is an eight-hour day, five days a week, or an equivalent schedule. *Id.* RFC is not the least an individual can do, but the most. SSR 96-8p at *2. The RFC assessment is a function-by-function assessment, with both exertional and nonexertional factors to be considered and is based upon all of the relevant evidence in the case record. *Id.* at *3-5. The ALJ will discuss the claimant's ability to perform sustained work activity on a regular and continuing basis, and will resolve any inconsistencies in the evidence. *Id.* at *7. In making an RFC assessment, the ALJ must consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, and must consider limitations and restrictions imposed by all of an individual's impairments, even impairments that are not severe. *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996); SSR 96-8p at *5. The ALJ is permitted to draw reasonable inferences from the evidence in making his decision, but the social security rulings also caution that presumptions, speculation, and supposition do not constitute evidence. *See, e.g.*, SSR 86-8, 1986 WL 68636, at *8 (S.S.A. 1986), *superseded by* SSR 91-7c, 1991 WL 231791, at *1 (S.S.A. Aug. 1, 1991) (only to the extent the SSR discusses the former procedures used to determine disability in children).

As to obesity, Bassett claims that the ALJ failed to mention her obesity as required by SSR 02-1p even though the medical records contain multiple references to the fact that she was obese and that her "obesity prevent[ed] her from performing the demands of her physical RFC." (Pl.'s Br. at 5.) The Social Security rulings recognize that obesity, though not a listed

impairment, can reduce an individual's occupational base for work activity in combination with other ailments. *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(Q) (2008); SSR 02-1p, 2000 WL 628049, at *5-7 (S.S.A. Sept. 12, 2002). A claimant's obesity must be considered at all steps of the sequential evaluation process. SSR 02-1p at *3. The ALJ must perform an "individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe." *Id.* at *4.

Although the ALJ failed to consider Bassett's obesity at any step of the sequential evaluation process, the Appeals Council[12] issued a decision after the ALJ's decision April 21, 2008 decision that did comply with SSR 02-1p. (Tr. 8-9.) In its decision affirming the ALJ's decision, the Appeals Council performed an assessment of the impact Bassett's obesity would have on her ability to function. Specifically, the Appeals Council recognized that Bassett experienced significant obesity and determined that such obesity would not further reduce the RFC established by the ALJ.

Furthermore, Bassett has failed to identify any evidence that indicates her obesity limited her ability to perform basic work activities and there is no objective evidence that any decreased functioning was attributable to her obesity. *See, e.g., Crossley v. Astrue*, No. 3:07-CV-0834-M, 2008 WL 5136961, at *5 (N.D. Tex. Dec. 5, 2008) ("Obesity is not a per se disabling impairment and Plaintiff has offered no medical evidence that her obesity actually results in these limitations or any further limitations beyond the sedentary work level found by the ALJ.") Because the

---

[12] The Appeals Council acts as final arbitrator of decisions of the ALJ. Whenever a claimant disagrees with an ALJ's decision, he may seek review by the Appeals Council. The Appeals Council may affirm, modify or reverse the ALJ's decision or it may adopt, modify or reject a recommended decision. 20 C.F.R. § 404.979. The decision of the Appeals Council is binding unless the claimant files suit in federal district court. 20 C.F.R. § 404.981.

Appeals Council properly considered the issue of obesity in accordance with SSR 02-1p and substantial evidence supports the ALJ's RFC assessment as unaffected by the issue of obesity, the Court concludes that remand is not required.

Bassett also argues that the ALJ erred in assessing her physical RFC because he failed to consider the side effects of dizziness and drowsiness caused by her taking Vicodin. (Pl.'s Br. at 5-6.) According to 20 C.F.R. § 404.1529(c)(3)(iv), the ALJ is required as part of the disability determination to consider "the type, dosage, effectiveness, and side effects of any medication" a claimant takes or has taken to alleviate his pain or other symptoms. *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999); *see* 20 C.F.R. § 416.929(c)(3)(iv); SSR 96-7p. Thus, an ALJ commits error when a claimant complains of the symptoms or side effects of a medication and the ALJ fails to evaluate those side effects and their impact on the claimant's RFC. *See Brown v. Barnhart*, 285 F. Supp. 2d 919, 935 (S.D. Tex. 2003). "Since the error involves violation of a regulation, reversal and remand is required only if the error is not harmless." *Skidis v. Comm'r of Soc. Sec. Admin.*, No. 3:08-CV-2181-N, 2009 WL 3199232, at *11 (N.D. Tex. Oct. 2, 2009). "Harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error." *Id.*; *see Zeno v. Barnhart*, No. 1:03-CV-649, 2005 WL 588223, at *13 (E.D. Tex. Feb. 4, 2005) ("Hence, plaintiff has not in any event satisfied her burden to demonstrate prejudice arising from the alleged error, and the court—in harmless error analysis—cannot fairly conclude that the result could have changed had [the] ALJ . . . engaged in a more explicit analysis of medication side effects."). *See also Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006).

24

In this case, the ALJ did not discuss the side effects of dizziness or drowsiness related to Bassett's taking of Vicodin. However, the only evidence in the record referred to by Bassett and that the Court can locate regarding the issue of dizziness and drowsiness *related to a time period in which she was taking Vicodin* is the following: (1) Bassett's notion in a "Disability Report—Appeal," dated no earlier than July 2007, that she was taking Vicodin for pain that caused her to have the side effects of dizziness and drowsiness. (Tr. 117).   Because Bassett fails to point to any specific evidence in the record that shows that any decreased functioning was attributable to such side effects, the Court concludes that any error committed by the ALJ in failing to take into consideration such side effects when formulating Bassett's RFC is harmless.

Finally, Bassett argues that the ALJ erred by formulating a physical RFC assessment for light work that failed to take into consideration her numerous physical impairments, including headaches, chest pain, shortness of breath, and pain in her legs and throughout her spine. (Pl.'s Br. at 6.) Specifically, Bassett argues that the ALJ failed to consider the following evidence: (1) letter from Langham dated April 2, 2007 indicating that Bassett had paresthesia in the left L5 dermatome, decreased neck and low back range of motion, taut and tender lumbar paraspinal musculature and moderate levels of degenerative joint disease at C2-C6 and that activities such as walking, standing, or sitting for extended periods of time would aggravate her condition, and (2) examination by Thirumurthi indicating that Bassett was unable to stand on her heels or squat and get back up without difficulty, had one leg that was shorter than the other, had a limited range of motion of the spine, had tenderness to palpitation along the paralumbar and paracervical muscles, had decreased sensation along the left anterior and lateral side of the left thigh, and had moderate degenerative disc disease with spondylosis. (Pl.'s Br. at 6.)

25

The ALJ is not required to incorporate limitations in the RFC that he did not find to be supported in the record. *See Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988). In his physical RFC assessment, the ALJ found, as noted above, that Bassett was limited to light work, so long as she is able to sit or stand, at her option, was unable to climb, kneel, squat or crawl, and could only stoop or crouch occasionally. In reaching this determination, the ALJ evaluated the medical evidence in the record, specifically mentioning Thirumurthi's examination of Bassett. (Tr. 29.) Although the ALJ did not specifically refer to the letter from Langham, the ALJ appears to have included the limitations found by both Langham and Thirumurthi as the RFC assessment does not require Bassett to stand or sit for extended periods of time (but instead allows her to sit or stand, at her option), as recommended by Langham and Thirumurthi, and does not allow for squatting or kneeling, as also recommended by Thirumurthi. As to Bassett's other alleged physical impairments, Bassett has failed to show that any decreased functioning was attributable to such impairments.

In this case, the ALJ thoroughly discussed the evidence in the record in making his physical RFC determination, adequately explained the reasoning for his RFC determination and for giving less weight to certain evidence, and exercised his responsibility as factfinder in weighing the evidence and in choosing to incorporate limitations into his RFC assessment that were most supported by the record. *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991). Because there is substantial evidence in the record that supports the ALJ's RFC assessment, the Court concludes that the ALJ did not err by failing to appropriately consider all of the functional limitations imposed by Bassett's physical impairments. Consequently, the Commissioner's decision as to this issue should be affirmed.

3.  Mental Residual Functional Capacity

Bassett also argues that the ALJ erred in determining Bassett's mental RFC assessment because he failed to properly consider the "May 2007 opinion of the agency's own consultative psychologist G.A. Jason Simpson, Psy..D. [sic]." (Pl.'s Br. at 7.)  Bassett, citing to *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995), claims that such failure is "clear error."[13]  (*Id.*)  The Commissioner, on the other hand, argues that substantial evidence supports the ALJ's mental RFC determination.  (Def.'s Br. at 17-18.)

In evaluating mental disorders under the Listing, the ALJ first considers whether a claimant has a medically determinable mental impairment.  *See* 20 C.F.R. Pt. 4, Subpt. P, App. 1 § 12.00.  To do so, the ALJ must specify the symptoms, signs, and laboratory findings that substantiate the presence of each impairment.  20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1); *Boyd v. Apfel*, 239 F.3d 698, 705 (5th Cir. 2001).  The regulations require the ALJ to evaluate the degree of functional loss resulting from the claimant's mental impairments.  20 C.F.R. §§ 404.1520a, 416.920a.  If an impairment is found, the ALJ must evaluate the claimant's limitations in four functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3).

After the ALJ rates the degree of functional limitation resulting from any mental impairment, the ALJ determines the severity of such impairment.  20 C.F.R. §§ 404.1520a(d), 416.920a(d).  If the degree of functional loss falls below a specified level in each of the four areas, the ALJ must find the impairment is not severe at Step Two of the sequential evaluation

---

[13] After reviewing *Martinez v. Chater*, the Court is unsure what error Bassett is alleging to.

process, which generally concludes the analysis and terminates the proceedings. 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1). If the ALJ finds that the mental impairment is severe at Step Two, then the ALJ must determine if it meets or equals a listed mental disorder under Sections 12.00-12.09 of the Listing. 20 C.F.R. §§ 404.1520a(d)(2), 416.920a(d)(2). To determine if it meets or is equivalent in severity to a listed mental disorder, the ALJ must compare the medical findings about the claimant's impairment and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2), 416.920a(d)(2). If the impairment is severe but does not meet or equal a listed mental impairment, then the ALJ must conduct an RFC assessment. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3); *see Boyd*, 239 F.3d at 705. The ALJ's written decision must incorporate pertinent findings and conclusions based on the technique and must include a specific finding of the degree of limitation in each of the functional areas described. 20 C.F.R. §§ 404.1520a(e)(2), 416.920a(e)(2).

As to Bassett's *mental* RFC, the ALJ determined that Bassett had a less than moderate concentration deficit and needed a job that had non-complex job duties and no contact with the general public during the performance of such duties. (Tr. 30.) In reaching this conclusion, the ALJ considered the evidence in the record, including the following: (1) Bassett's testimony that since her "stroke" in November 2006 she had problems focusing and memory difficulties, and (2) the psychological and mental status examination of Bassett by Simpson in May 2007 in which Simpson diagnosed Bassett with a panic disorder without agoraphobia and rated her GAF score at 61. (Tr. 29.) The ALJ also stated that he "concluded that the claimant's [sic] has a mild impairment in activities of daily living, moderate difficulties in maintaining social functioning,

28

mild to moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation." (*Id.*)

After reviewing the ALJ's decision, the Court concludes that the ALJ properly included his findings relating to Bassett's functional limitations in the four functional areas into this mental RFC determination and such findings are supported by substantial evidence. The ALJ properly discussed the evidence in the record in making his mental RFC determination, including Simpson's opinions, explained the reasoning for his RFC determination, and exercised his responsibility as factfinder in weighing the evidence and in choosing to incorporate limitations into his mental RFC assessment that were most supported by the record. *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991). Because there is substantial evidence in the record that supports the ALJ's mental RFC assessment, the Court concludes that the ALJ did not err.

4. ALJ's Step Five Analysis

Bassett also claims that the ALJ erred in finding at Step Five of the sequential evaluation process that there were a significant number of jobs that existed in the national economy that Bassett could perform. (Pl.'s Br. at 8.) Bassett bases her argument on her previous arguments that the "ALJ failed to properly evaluate Plaintiff's credibility; did not properly consider the impact of her obesity, medication side effects, and numerous physical impairments; and improperly determined her RFC." (Pl.'s Br. at 8.) Because the Court has already found, as discussed above, that the ALJ did not commit any error regarding these issues, the Court concludes that the ALJ did not err in his findings at Step Five based on these same issues.

Bassett also argues that the ALJ "had a duty to perform a function-by-function analysis of Plaintiff's RFC and to assess her ability to perform these functions on a regular and continuing

29

basis." (Pl.'s Br. at 9.) Bassett's argument appears to be based on a line of cases involving the United States Court of Appeals for the Fifth Circuit's holding in *Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986). In that case, the Fifth Circuit held that an ALJ must, in certain situations, make a finding regarding the claimant's ability to maintain a job and such finding should be supported by substantial evidence. *See also Frank v. Barnhart*, 326 F.3d 618, 621 (5th Cir. 2003); *Watson v. Barnhart*, 288 F.3d 212 (5th Cir. 2002). Bassett asserts that the ALJ failed to make such a determination in her case as required in cases involving severe mental illness. (Pl.'s Br. at 9.) The Court disagrees.

To begin with, there is no evidence in this case that Bassett suffers from a mental illness that involves intermittently recurring symptoms that are of such sufficient frequency or severity to prevent her from holding a job for a significant period of time as required by *Singletary*, *supra*, and its progeny. Furthermore, the ALJ must make such a specific finding that a claimant can maintain employment only in cases where there is "evidence that a claimant's ability to maintain employment would be compromised despite his ability to perform employment as an initial matter, or an indication that the ALJ did not appreciate that an ability to perform work on a regular and continuing basis is inherent in the definition of RFC." *See Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003). Because Bassett has pointed to no such evidence, the Court concludes remand is not required.

Citing to 20 C.F.R. § 201.00(h)(3),[14] Bassett claims that the ALJ's hypothetical questions to the VE were unsupported by the evidence, stating that "in cases where a claimant is found

---

[14] The Court notes that 20 C.F.R. 201.00(h)(3) is not a proper citation as no such section of the Code of Federal Regulations exists. The Court assumes that Bassett was attempting to cite to the Medical-Vocational Guidelines in 20 C.F.R. Part 220, App. 2. However, Section 201 in these Guidelines is inapplicable as it deals with cases in which a claimant has been limited to sedentary work.

unable to perform the full range of light work, as here, the ALJ is required to obtain vocational testimony regarding the impact of the limitations or restrictions on the number of available jobs in the national economy." (Pl.'s Br. at 8.) The Fifth Circuit has made it clear that the hypothetical question posed by the ALJ to the VE must encompass all of the disabilities of the claimant recognized by the ALJ. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). Without such inclusion, the determination of non-disability based on the hypothetical cannot stand. *Id.*

In this case, the ALJ determined, *inter alia*, that Bassett had mild impairment in activities of daily living, moderate difficulties in maintaining social functioning, and mild to moderate difficulties in maintaining concentration, persistence or pace. As discussed above, he included such limitations in his RFC assessment by limiting Bassett to no contact with the general public, the need for non-complex job duties, and noting that she had a less than moderate concentration deficit. (Tr. 30.) He presented this exact RFC assessment in the hypothetical to the VE. (Tr. 353-54.) Thus, the hypothetical was proper and the ALJ could rely on the VE's opinion as substantial evidence. *See, e.g.*, *Bowling*, 36 F.3d at 436-38.

## II. RECOMMENDATION

It is recommended that the Commissioner's decision be affirmed.

## III. NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONAND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within fourteen (14) days after the party has been served with a copy of this document. The Court is hereby extending the deadline

31

within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until **July 16, 2010**. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

## IV. ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until **July 16, 2010** to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED June 25, 2010.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE

JLC/knv

32